## GREAT WESTERN INSURANCE COMPANY *v.* UNITED STATES.

## PAULSON, Receiver, *v.* UNITED STATES.

### APPEALS FROM THE COURT OF CLAIMS.

Argued October 14, 15, 1884.—Decided November 10, 1884.

A claim against the United States for a part of the money received from Great Britain in payment of the award made at Geneva under the Treaty of Washington, is both a claim growing out of a treaty stipulation and a claim dependent upon such stipulation, and is excluded from the jurisdiction of the Court of Claims by § 1066 Rev. Stat.

These were suits against the United States to recover portions of the Geneva award.   The insurance company sued on

its own account; the plaintiff Paulson, as receiver of the Columbian Insurance Company. Motions to dismiss for want of jurisdiction were made in both cases, and were heard together. The facts making the case are stated in the opinion of the court.

*Mr. A. J. Willard* and *Mr. Edwin B. Smith* for the Great Western Insurance Co., appellant.

*Mr. John McDonald* for Paulson, receiver, appellant.

*Mr. Solicitor-General* for appellee.

Mr. JUSTICE MILLER delivered the opinion of the court, in the case of the Great Western Insurance Company as follows:

This is an appeal from a judgment of the Court of Claims, dismissing a petition for want of jurisdiction. This was not done on a demurrer or plea, but on the following motion :

" The Assistant Attorney-General, on behalf of the United States, moves the court to dismiss the petition in this cause, for the reason that it does not disclose a cause of action within the jurisdiction of the court."

The motion, on hearing, was sustained (see 19 C. Cl. 206), and it is this judgment of dismissal we are asked to review.

The petition sets forth that the claimant was an insurance company, engaged in the business of insuring against losses by sea, and that it insured, in numerous cases, vessels, cargoes, and freight, owned by citizens of the United States, against war risks during the civil war between the United States and the Confederate States. That by reason of the losses and destruction of the vessels and cargoes so insured, inflicted by the Confederate cruisers Alabama and Florida, this claimant paid the sum of $309,635 to the owners of the vessels and cargoes, and that claimant not only became by law subrogated to rights of such owners against the parties who caused the loss, but took assignments of the claims from the losers to itself.

The petition then alleges that the British government, by its laches and unfriendliness, in permitting these cruisers to be built, fitted out, and furnished with supplies within its domin-

ion, became responsible for the losses inflicted on the owners of the vessels and cargoes captured and destroyed by them. That petitioner placed these claims in the hands of the Secretary of State, with the evidence to prove them against that government. The negotiation, treaty, and award known as the Alabama Claims Treaty and the Geneva Award are then set out, with the allegation that the sum now claimed by petitioner entered into and constituted a part of the $15,500,000 which was awarded to the United States in satisfaction of all claims of this character.

It is alleged that the money so awarded was paid to the United States, by reason of which and certain subsequent dealings with this money, which was finally paid into the treasury of the United States by order of Congress, an implied contract arose on the part of the defendants to pay to claimant the amount of the losses thus set forth, with interest thereon, which is alleged to be over $500,000. The names of the vessels and the amounts insured in each case, on vessel, cargo, and freight, are shown by a schedule attached to the petition. From this it appears that twelve of these vessels were captured by the Alabama and eight by the Florida. The names of the owners of the vessels, cargoes, and freight are distinctly set forth and the amounts paid to each.

The claimant, in its petition, places the right to recover on the ground that by virtue of the transactions between this government and Great Britain, and the receipt by the former of the money paid by the latter on account of these claims, the United States became a trustee for the claimant to the amount of its loss, and liable to pay the same; or, as expressed in another form, the money was received by the government for the use and benefit of the petitioner, and when it was paid into the treasury the United States became indebted to the petitioner for that amount.

The same ground is assumed in the argument of counsel in this court, the claim being treated essentially as *indebitatus assumpsit* for money had and received to the use of plaintiff.

If, therefore, the claim is well "founded on a contract, express or implied, with the United States," within the meaning

of § 1059 Rev. Stat., and is not forbidden by any other act of Congress, the petition should not have been dismissed; but if it does not present such an implied contract (for there is no pretence of an express contract), or if for any other reason the case is one of which the Court of Claims is forbidden to entertain jurisdiction, then the judgment of dismissal was correct.

The case has been mainly argued here on the proposition that the transaction does raise an implied promise on the part of the government of the United States to pay appellant the amount of money paid by it on account of the losses inflicted by the Alabama and Florida, or such proportion of that loss, if it be any less than the whole, as was covered by the award. And the judgment of the court below is defended largely upon the ground that no such legal obligation or contract arises from the transaction.

The opinion of the learned Chief Justice of the Court of Claims is an able presentation of this view.

But the judgment of that court is also defended on the ground that whatever may be the moral or the legal obligation of the government to the appellant, growing out of the treaty, the award, and the receipt of the money, it does not present a case cognizable in the Court of Claims, both because the acts of Congress creating the court and conferring its jurisdiction were not intended to embrace this class of cases, and because they were in express terms excluded from it.

If this latter proposition be sound, we deem it inappropriate to express any opinion on the other, because the fund in the treasury, paid under the Geneva Award, has been already largely distributed under the decisions of one special commission appointed for that purpose, whose powers have expired, and is now under administration by another commission created for the same purpose by another act of Congress. And although it is said that neither of these commissions could, under the law of its creation, take cognizance of appellant's claim, it is matter of public notoriety that the subject of claims of this class is occupying the attention of Congress, and bills on that subject are now pending before it.

Under these circumstances we do not think it appropriate to

express an opinion on the legal or moral obligation of the government in the matter, unless it is in the line of a plain duty.

The question of jurisdiction is the one raised by the motion, and is always to be decided before the court can properly inquire into the merits, and we are of opinion that, even if the circumstances recited in the petition can be held to raise an implied obligation on the part of the United States, the Court of Claims is forbidden to take jurisdiction in this class of cases.

§ 1066 Rev. Stat. enacts that "the jurisdiction of said court shall not extend to any claim against the government not pending therein on December one, eighteen hundred and sixty-two, growing out of or dependent on any treaty stipulation entered into with foreign nations or with Indian tribes."

This language is comprehensive and explicit. If the cause of action *grows out* of a treaty stipulation, the court cannot entertain it. If it is *dependent* on any such stipulation, the same result follows.

In any ordinary or usual sense of the words here used, appellant's claim, as set forth in the petition, grows out of the stipulations of the Treaty of Washington. The allegation is, that the United States took charge of the claim of petitioner against Great Britain for the injuries inflicted by the Alabama and the Florida. That, by a treaty on that subject, Great Britain stipulated that she would pay this claim to the United States, as petitioner alleges, for the use of said petitioner. In accordance with said stipulation, Great Britain did pay it to the United States, and the purpose of payment under the treaty inhering in the receipt of the money constitutes the foundation of appellant's claim. The intervention of the Board of Arbitration and its award as a means of ascertaining the liability of Great Britain, does not change the fact that the final recognition and payment of the claim *grows out of the stipulation of the treaty.*

In a still clearer sense it is obvious that this recognition of the claim by the award and its payment to the United States, were dependent on the treaty stipulation. Without the treaty the award would have bound nobody, and would have been at most a friendly recommendation. By virtue of the treaty it

became a most solemn and important international obligation, whereby Great Britain became bound, as much as a nation can be bound, to pay the amount of the award, and, at the same time, became freed and discharged from any further liability on account of any claims of that class.

The effort of counsel to ignore the treaty, the award and the receipt of the money by the United States as the foundation of appellant's claim, and rest the right to recover solely upon the act of March 31, 1877, by which the fund was changed from an investment in government bonds and paid into the government treasury, is too fanciful for serious consideration. If the government had not become liable, by reason of the original receipt of the money from Great Britain, under the treaty by which that country was discharged and released from the claim of plaintiff, it is difficult to comprehend how it became liable by a mere change in the manner of keeping the account. Whether the United States was liable on the bonds held in its own treasury vaults, or on account of the actual money represented by those bonds in the same vaults, cannot be material in estimating the nature and extent of that obligation.

Nor can we assent to the proposition that the section cited was designed to prevent foreign governments or Indian tribes from suing the United States to enforce rights founded on treaties. No such suit has ever been brought, either before or since the enactment of this provision. It is not believed that without it any one ever supposed that the Court of Claims had jurisdiction of suits by Indian tribes or foreign nations against the United States. It could not have been passed, therefore, to prevent such a suit.

That the restriction was intended to apply to cases of the character of the one now before us was substantially decided in *Atocha's Case*, 17 Wall. 439.

In that case, under the treaty of Guadaloupe Hidalgo with Mexico, of February 2, 1848, our government undertook to satisfy the claims of her citizens against Mexico to the amount of $3,250,000. In execution of this stipulation Congress passed an act creating a board of commissioners, before whom such citizens should appear and establish their claims.

When the two years which terminated the existence of the commission had expired, a considerable balance of this sum remained in the hands of the government, against which no claims had been established.

In this condition a special act of Congress authorized Atocha to present his claim to the Court of Claims, and if established to the satisfaction of that court, it was to be paid out of this fund. That court found in his favor, and the United States asking an appeal it was refused. On an application to this court for a writ of mandamus to compel the Court of Claims to allow the appeal, it was urged by counsel for the government that the case being one cognizable under the general jurisdiction of that court on an implied contract, there was a right to appeal, though by the special statute referring the case to that court no such right was given.

The court, in reply to this, said that since the act of March 3, 1862, in which the provision, embodied as § 1066 of the Rev. Stat., was first passed, the Court of Claims had no jurisdiction over this class of cases by virtue of the acts conferring its general powers. "These acts have since then (said the court) applied only to claims made directly against the United States, and for payment of which they were primarily liable, if liable at all, and not to claims against other governments, the payment of which the United States had assumed or might assume by treaty. The act of June 25, 1868, whilst allowing appeals in behalf of the United States from all final judgments of the Court of Claims, did not change the character of the claims of which that court could previously take cognizance. Claims under treaty stipulations are not brought within it, and when jurisdiction over such claims is conferred by special act, the authority of that court to hear and determine them is limited and controlled by the provisions of that act."

That was a case in which, by the express terms of the treaty, the United States had assumed the debt of Mexico to Atocha and others of his class. The present is a case in which such assumption is implied from the circumstances of the treaty and the receipt of the money.

In the former case the United States agreed, for a valuable

consideration in land or territory, to pay to Mexico $3,250,000 to her creditors residing in the United States. In the latter the government received $15,500,000 from England, under what is alleged to be an implied promise to pay a class of American claims against her. We can see no difference in principle in the two cases, as they have relation to the fact that both claims grew out of, and were dependent on, treaty stipulations.

This limitation of the jurisdiction of the Court of Claims is in accord with the uniform course of the government in dealing with claims of our citizens against foreign governments. In such cases, where those governments have acknowledged a liability, but the amount or the number of the claims is in controversy, mixed commissions, composed of arbitrators appointed by each party, and an umpire, have usually been created by a treaty, which made the award of the commission obligatory.

In cases like that of Guadaloupe Hidalgo and the Treaty of Washington, under which the present claim arises, where the foreign nation pays, or agrees to pay, to this government a fixed sum in discharge of the class of claims which is the subject of treaty, Congress has provided a commission at home to pass upon the claims asserted under the treaty.

In no case that we are aware of has Congress conferred on any judicial tribunal the power to adjudicate such claims as a class, and in the case of Atocha, where a reference of a single claim was made to the Court of Claims, its action was rather in the nature of a commission to ascertain the facts than a judicial tribunal, as in other cases, and hence no appeal was allowed.

In the case of the Geneva Award, one such commission has been created by act of Congress, and its term of service has expired. Another is now in existence, under another act, for the same purpose, namely, the distribution of the sum paid under that award, and Congress is still devoting its attention to other means for the proper distribution of the remainder of this fund.

For these reasons we are of opinion that the Court of Claims

had no jurisdiction of the case presented by the petition of appellant, and its decree dismissing it is

*Affirmed.*

In Paulson's case the learned Justice added : This case was tried at the same time, in the Court of Claims, as the Great Western Insurance Co. v. the same defendant, and was decided on the same facts and the same judgment was then rendered.

It was argued in this court with that case, and the judgment of the Court of Claims is affirmed for the reasons given in the opinion in that case.